[No. 23981-3-I.    Division One.    December 11, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN
SPURGEON, *Appellant*.

*Dennis Benjamin* and *Suzanne Lee Elliott* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Donna L. Wise, Deputy,* for respondent.

FORREST, J. — Spurgeon appeals his conviction for aggravated murder in the first degree. We affirm.

On December 15, 1988, Spurgeon, and two companions, robbed cabdriver Ed Soroe at gunpoint. On December 30, 1988, Spurgeon, with Alonso French, Michael Brown and Norman Edwards (Edwards was also involved in the first robbery), robbed cabdriver Richard Bruder. The second robbery ended in Bruder's death. Spurgeon does not deny shooting Bruder, but claims that the gun was fired accidentally. Spurgeon was charged with aggravated first degree murder (and the alternative crime of first degree murder, felony murder), and robbery in the first degree.

The facts of the two robberies are essentially the same. In both robberies Spurgeon and his companions called for a cab. After Spurgeon and the others entered the cab,[1] Spurgeon, sitting behind the driver, put a gun to the driver's head and ordered him to drive to a secluded location. The driver was tied with his own shoelaces, lying facedown on the front seat of the cab. The driver was then robbed, the cab keys were taken, and Spurgeon and the others left.

The second robbery only slightly deviated from this pattern. In this instance, Spurgeon told Brown to disable the radio. When the cab was parked Spurgeon gave Brown the gun while Spurgeon tied Bruder. While Spurgeon was still in the cab Brown heard Bruder say he was a security guard. Spurgeon then got out of the cab, took his gun from Brown, reached into the car, pressed the gun to Bruder's head and shot him. After Bruder was shot, Spurgeon and the others ran into the woods and proceeded with their plan to steal guns and marijuana plants from an acquaintance's home.

Spurgeon was arrested in January 1989 on an outstanding misdemeanor warrant. While in custody, he was twice advised of his constitutional rights, told the details of the

---

[1] In the second case, only Spurgeon and Edwards entered the cab while the others hid. Bruder was ordered to stop the cab to pick up the others after the gun was placed to his head.

police investigation of the robberies and murder, and was then asked if he wanted to talk about the incidents. Spurgeon responded to this single question with incriminating statements and a request for an attorney. The police immediately ended the interrogation.

All of Spurgeon's codefendants entered plea agreements and each, except French, testified at Spurgeon's trial. Spurgeon was convicted and he appeals.

### DOES FAILURE TO TAPE-RECORD A CUSTODIAL INTERROGATION VIOLATE THE DEFENDANT'S DUE PROCESS RIGHTS?

■ Spurgeon urges this court to adopt a rule requiring all custodial police interrogations to be tape-recorded before any statements made by a defendant may be admitted at trial because failure to do so violates his due process rights. Spurgeon recognizes, as does the only authority he cites for this proposition, *Stephan v. State*,[2] that such recording is not required by federal due process.[3] He then proceeds to cursorily discuss the factors presented in *State v. Gunwall*.[4] We do not interpret *Gunwall* to mandate a formalistic recital of these factors in the abstract. Nor do we believe these factors, with the possible exception of preexisting state law, will ever compel an expansion of a right under the state constitution. Rather, they are to be used in evaluating a specific claim and not all of them will be relevant to every case.[5] Here, none of the *Gunwall* factors support the conclu-

---

[2]711 P.2d 1156 (Alaska 1985).

[3]*California v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984).

[4]106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986). The six *Gunwall* factors are: (1) the text of the state provision; (2) differences in the texts of the federal and state provisions; (3) state constitutional history; (4) preexisting state law; (5) structural differences between the federal and state constitutions; (6) whether it is a matter of particular state or local concern.

[5]As stated in *Gunwall*, at 62-63:
"Thus, the foregoing six criteria are aimed at: (1) suggesting to counsel where briefing might appropriately be directed in cases wherein they are urging

sion that the Washington State Constitution requires police officers to tape-record interrogations conducted at the jailhouse on penalty of exclusion of the evidence if they fail to do so.

■ We approach this issue in light of the Supreme Court statement in *Rozner v. Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991):

> This court traditionally has practiced great restraint in expanding state due process beyond federal perimeters. . . . Although not controlling, federal decisions regarding due process are afforded great weight due to the similarity of the language.

■ Since the language of the state and federal constitutions is the same, and there is no contemporary record showing a broader meaning was intended by those adopting the Washington Constitution, the first three *Gunwall* factors do not support Spurgeon's argument. Indeed, since the due process clause had an almost 100-year history in both state and federal courts before the adoption of the Washington Constitution, there is a strong presumption that by adopting the same language the drafters of the state constitution intended the same protections.[6] It is true that the structure of the two governments is different, one a grant of limited powers (although after 200 years these powers have become rather sweeping) to the national government, as opposed to a state constitution vesting general sovereign power except as it is limited. However, this historical fact is present in every case. A citizen's right to due process is equally important and valid against a government of limited power as against one of general power. We find no

---

independent state constitutional grounds; and (2) helping to insure that if this court does use independent state constitutional grounds in a given situation, it will consider these criteria to the end that our decision will be made for well founded legal reasons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court."

[6]Where the United States Supreme Court narrows previously established due process protections which have been incorporated into Washington law, an independent state constitutional ground may well be appropriate.

basis in the difference in governmental structure suggesting a more expansive reading of the Washington Constitution to require recording of interrogations. Likewise, the fact that criminal law enforcement is primarily a function of state government rather than the national government is true for every criminal case. Although a Washington citizen is more likely to come in contact with the criminal law in the Washington courts rather than the federal courts, that does not mean that the quantum of protection should be different.

We find the relevant factor in this case, as in *Gunwall* itself, is existing Washington law. While the Washington courts have not discussed the need to record interrogations, analysis of Washington rules regarding preservation of evidence suggests a result contrary to the Alaska holding. Indeed, it is not technically a matter of preservation of evidence but rather the creation of additional evidence in the form of a tape of the interview. The difference in approach is shown in a closely analogous area, preservation of the evidence of Breathalyzer samples. The Alaska court had, prior to *Stephan*, held the Alaska Constitution requires preservation of Breathalyzer evidence even though the United States Supreme Court had rejected such a duty under the United States Constitution.[7] In *Stephan* the Alaska court then noted that the rule regarding Breathalyzers controls the issue of recorded interrogations.[8] Washington courts have addressed the preservation of Breathalyzer evidence with a contrary result. In *Bellevue v. Ohlson*[9] this

---

[7] In *California v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984), the United States Supreme Court held law enforcement agencies do not have a duty to preserve Breathalyzer results. Prior to *Trombetta* Alaska found such a duty under the state constitution in *Municipality of Anchorage v. Serrano*, 649 P.2d 256 (Alaska Ct. App. 1982). *Trombetta* was specifically rejected in *Gundersen v. Municipality of Anchorage*, 792 P.2d 673 (Alaska 1990).

[8] *Stephan*, 711 P.2d at 1160.

[9] 60 Wn. App. 485, 803 P.2d 1346 (1991). In *State v. Canaday*, 90 Wn.2d 808, 585 P.2d 1185 (1978), the court rejected the claim that the State had a duty to preserve the evidence of ampuls used in the Breathalyzer.

court held that the Washington law is consistent with the federal rule in *California v. Trombetta,* 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984). Washington's holding regarding preservation of Breathalyzer samples, being contrary to Alaska's, is a strong indication that our constitution does not require tape-recorded interrogations.

Washington does recognize a constitutional duty of the State to preserve material evidence.[10] The generality of that holding was subsequently limited to mean that in cases involving the destruction of evidence the defendant has the burden of proof to show a reasonable possibility that the missing evidence would have affected his ability to present a defense.[11] Most recently our Supreme Court held the destruction of or failure to preserve evidence does not violate a defendant's due process rights absent a showing the police acted in bad faith.[12] The duty to create additional evidence in the form of a tape of an interrogation is certainly not required by these authorities.

Finally, it is our view that such a sweeping change in longstanding police practice should be made only after a full hearing of all the policy and financial implications and with adequate advance notice to law enforcement in the form of the adoption of a rule of evidence or a statute mandating recording.[13] We hold the Washington Con-

---

[10]*State v. Wright,* 87 Wn.2d 783, 557 P.2d 1 (1976).

[11]*State v. Vaster,* 99 Wn.2d 44, 52, 659 P.2d 528 (1983).

[12]*State v. Straka,* 116 Wn.2d 859, 883-84, 810 P.2d 888 (1991) (citing *Arizona v. Youngblood,* 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)).

[13]*See Gaglidari v. Denny's Restaurants, Inc.,* 117 Wn.2d 426, 448, 815 P.2d 1362 (1991). The Supreme Court in denying damages for emotional distress for breach of contract commented:

This will represent a profound change in the law, the implication of which probably can be explained only by adverting to the 'Law of Unintended Consequences'. If there is to be a change of the common law, we believe a more prudential approach would be for the Legislature to consider the matter prior to such a change occurring. In the words of the *Foley* [v.

stitution does not require taping of custodial interrogations.[14]

Spurgeon's reliance on *State v. Myers*[15] is misplaced. In *Myers* the court held that the failure to record statements made in securing a telephonic search warrant deprived the appellate court of a record to review the probable cause determination and that the evidence seized pursuant thereto must be suppressed. Search warrants must be based on sworn testimony.[16] The rule is implemented in CrR 2.3(c), the material portion of which reads as follows:

> There must be an affidavit . . . or sworn testimony establishing the grounds for issuing the warrant. The sworn testimony may be an electronically recorded telephonic statement. The recording or a duplication of the recording shall be a part of the court record and shall be transcribed if requested by a party if there is a challenge to the validity of the warrant or if ordered by the court.

In *Myers* the court held that the failure to make the proper recording was a gross deviation from the require-

---

*Interactive Data Corp.*, 47 Cal. 3d 654, 694, 765 P.2d 373, 254 Cal. Rptr. 211 (1988)] court:

> Significant policy judgments affecting social policies and commercial relationships are implicated in the resolution of this question in the employment termination context. Such a determination, which has the potential to alter profoundly the nature of employment, the cost of products and services, and the availability of jobs, arguably is better suited for legislative decisionmaking.

[14]We note that at least seven other jurisdictions that have considered this question have also rejected the Alaska rule. *See State v. Rhoades*, 119 Idaho 594, 809 P.2d 455 (1991) (Idaho); *Gale v. State*, 792 P.2d 570 (Wyo. 1990) (Wyoming); *Jimenez v. State*, 105 Nev. 337, 775 P.2d 694 (1989) (Nevada); *People v. Everette*, 187 Ill. App. 3d 1063, 543 N.E.2d 1040 (1989) (Illinois); *State v. Gorton*, 149 Vt. 602, 548 A.2d 419 (1988) (Vermont); *Williams v. State*, 522 So. 2d 201 (Miss. 1988) (Mississippi); *Coleman v. State*, 189 Ga. App. 366, 375 S.E.2d 663 (1988) (Georgia).

[15]117 Wn.2d 332, 815 P.2d 761 (1991).

[16]*Myers*, at 337.

510

ments of the rule.[17] Obviously, if there was a court rule requiring interrogations to be tape-recorded and without reasonable excuse the rule was not complied with, suppression would follow. There being no such statute or rule, *Myers* is inapposite.

Affirmed.

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SCHOLFIELD and PEKELIS, JJ., concur.

Review denied at 118 Wn.2d 1024 (1992).