# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of

SHAWN T. SKELTON,

          Appellant.

No. 84214-5-I

DIVISION ONE

UNPUBLISHED OPINION

      BIRK, J. — In this appeal, Shawn Skelton challenges the trial court's order civilly committing him as a sexually violent predator (SVP). Pointing to due process case law and out-of-state case law discussing what it calls "case-specific hearsay,"[1] Skelton claims among other things that the trial court erred by allowing the State's expert to relay inadmissible information explaining the basis for his opinions under ER 703, ER 705, and ER 403. Finding no error, we affirm.

I

      In April 2009, Shawn Skelton posted a classified advertisement on Craigslist,[2] seeking a woman who was willing to have sex with him, but, he wrote, "here is the catch," before finishing "I want to kill her." Craigslist alerted the Seattle Police Department (SPD) to Skelton's advertisement. SPD's assigned detective responded covertly, purporting to offer to make a sex worker available to Skelton.

---

[1] E.g., Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); People v. Sanchez, 63 Cal.4th 665, 682, 374 P.3d 320 (2016).

[2] "Craigslist" is an online classifieds platform.

He e-mailed Skelton, telling him that he had a girl that he did not trust anymore and that maybe Skelton "could do both [of them] a favor" and he could "have [his] fun," implying that Skelton could fulfill his goal posted in the advertisement by killing the sex worker. In the ensuing e-mail exchange, Skelton asked for details about how the girl's body would be taken care of, demanded payment, discussed the timing and location of the meeting, told the detective to tell the girl that he wanted to do "all kinds of crazy abuse fetish stuff," and when arrangements had been made, told the detective, "Alright, consider it taken care of."

When Skelton arrived at the designated meeting location, he was arrested and found carrying a knife with a three to three and a half inch blade, shoelaces, and a chain. In January 2010, Skelton pleaded guilty to first degree attempted robbery and second degree attempted assault with sexual motivation. He also pleaded guilty to indecent exposure with sexual motivation for an earlier incident in November 2008. The court imposed determinate sentences of 40.5 months in prison for Skelton's attempted robbery conviction and 12.5 months, plus a 12 month enhancement, for his indecent exposure with sexual motivation conviction. It imposed an indeterminate sentence of 12 months to 10 years, plus a 24 month enhancement, for his attempted assault with sexual motivation conviction. In July 2020, the State initiated SVP civil commitment proceedings against Skelton.

To commit Skelton, the State had to prove that he (1) has been convicted or charged with a crime of sexual violence, and (2) suffers from a mental abnormality or personality disorder (3) which makes him likely to engage in predatory acts of sexual violence if not confined in a secure facility. RCW

2

71.09.020(19). Skelton's conviction for second degree attempted assault with sexual motivation satisfied the first element and was uncontested. Dr. Craig Teofilo, testifying as the State's expert, concluded that Skelton was an SVP under the criteria set forth in chapter 71.09 RCW.

Dr. Teofilo stated that he has conducted over 500 SVP evaluations. He testified that it is customary for SVP evaluators to rely on police reports, court documents, Department of Correction (DOC) records, medical records, mental health records, and sex offender treatment records. In Skelton's case, Dr. Teofilo estimated that he had reviewed over 4,000 pages of documents. Dr. Teofilo diagnosed Skelton with other specified paraphilic disorder (OSPD), with somnophilic, coercive, and sadistic traits. This provided the basis for Dr. Teofilo's conclusion that Skelton had a mental abnormality, as defined under Washington law. And he concluded Skelton was "more likely than not to commit a future crime of predatory sexual violence if not committed."

In reaching this opinion, Dr. Teofilo relied on "maybe 25 or 27 datapoints." These included a 2014 petition for protection order filed by Skelton's ex-girlfriend, B.K. In the petition, filed while Skelton was in DOC custody, B.K. alleged that Skelton had violently raped her twice, in 2007 and 2008. During pretrial motions Skelton sought to exclude all details from the petition, arguing the allegations were unadjudicated. The trial court provided a limiting instruction to the jury and allowed Dr. Teofilo to testify about B.K.'s allegations as part of the basis for his opinions for the limited purpose of evaluating the credibility of his opinions.

At the conclusion of the 10 day commitment trial, the jury returned a unanimous verdict finding Skelton is an SVP, on whose basis the court entered the order of commitment. Skelton appeals.

II

Skelton asserts the trial court erred by allowing Dr. Teofilo to discuss B.K.'s protection order petition, including her allegations that Skelton had violently raped her twice. We disagree. The trial court properly admitted this testimony as basis evidence under ER 703 and 705, and controlling Washington case law, and properly balanced the probative value of the evidence against potential prejudice.

We review trial court decisions to admit evidence for abuse of discretion. State v. Quaale, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). Trial courts have "considerable discretion" to determine if evidence is admissible. Id. " 'Where reasonable persons could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion.' " Id. (quoting State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). An abuse of discretion occurs when a trial court exercises discretion in a manifestly unreasonable way or based on untenable grounds or reasons. Id. at 197.

A

Skelton urges this court to follow a California decision regarding "case-specific hearsay," which held, under Sixth Amendment confrontation principles, that inadmissible evidence an expert describes to the jury and relies on as being true is being admitted for the truth of the matter, and adopted a rule barring such evidence regardless of limiting instructions. People v. Sanchez, 63 Cal.4th 665,

4

684-85, 374 P.3d 320 (2016).  Because Sanchez runs counter to the plain text of ER 703, ER 705, and controlling Washington case law, we decline to follow Skelton's proposed rule.

ER 703 allows experts to testify about the "facts or data in the particular case upon which the expert bases an opinion" which "need not be admissible in evidence" so long as they are "of a type reasonably relied upon by experts in the particular field."  "Thus, the rule allows expert opinion testimony based on hearsay data that would otherwise be inadmissible in evidence."  In re Det. of Marshall, 156 Wn.2d 150, 162, 125 P.3d 111 (2005).  ER 705 grants trial courts discretion to require disclosure of the underlying facts or data of an expert opinion, including the relay of "hearsay or otherwise inadmissible evidence to the trier of fact to explain the reasons for [an expert's] opinion, subject to appropriate limiting instructions." In re Det. of Leck, 180 Wn. App. 492, 513, 334 P.3d 1109 (2014).  The rule permits an expert to relay inadmissible information on which the expert has relied for this limited purpose.  State v. Caril, 23 Wn. App. 2d 416, 428, 515 P.3d 1036 (2022), review denied, 200 Wn.2d 1025, 522 P.3d 50, cert. denied, 144 S. Ct. 125 (2023). Conversely, courts retain discretion to limit the expert's disclosure of inadmissible limited purpose evidence when the proffer would be unfairly prejudicial, misleading, or simple avoidance of the rules of evidence.  Id. at 427-28.

In Marshall, a licensed clinical psychologist retained by the State reviewed records of the defendant's "criminal and psychiatric history, including police reports, legal records, treatment records, juvenile records, psychological and psychiatric evaluations, and medical records" to conclude that the defendant

5

should be committed as an SVP. Marshall, 156 Wn.2d at 154-55. The records were of a kind reasonably relied on by experts in the field, but were challenged for "relat[ing] inadmissible hearsay as factual assertions." Id. at 161-62. The court found no abuse of discretion because the evidence was admitted subject to an appropriate limiting instruction consistent with ER 703 and ER 705.[3] Marshall, 156 Wn.2d at 163.

In another SVP commitment case, In re Detention of Coe, 175 Wn.2d 482, 513, 286 P.3d 29 (2012), the defendant challenged the trial court's decision to allow the State's expert to disclose allegations of 20 unadjudicated sexual offenses to the jury. The trial court gave the following limiting instruction to the jury,

> "[The expert] is about to testify regarding the factual bases of her opinion. You may consider this testimony only in deciding what credibility and weight should be given to the opinions of [the expert]. You may not consider it as evidence that the information relied upon by the witness is true or that the evidence described actually occurred."

---

[3] The analysis of Marshall is not changed by Smith v. Arizona, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024). Smith held that when an expert in a criminal case relays inadmissible facts as the basis for an opinion and they support the expert's opinion only if they are true, then the defendant's right in a criminal case to confront the defendant's accusers is triggered. Smith, 602 U.S. at 802. But it "is well settled that the Sixth Amendment right to confrontation is only available to criminal defendants." In re Det. of Stout, 159 Wn.2d 357, 369, 150 P.3d 86 (2007). Civil commitment under Washington's SVP law is not a criminal proceeding and therefore not subject to the Sixth Amendment. Id.; cf. Allen v. Illinois, 478 U.S. 364, 374, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986) (Illinois SVP law not criminal proceeding for purposes of the Fifth Amendment). Assuming Dr. Teofilo relied on B.K.'s allegations for the truth of the matter asserted, that made them hearsay and inadmissible, but his relaying that hearsay could not implicate a confrontation right because Skelton did not have a confrontation right in this civil proceeding.

Id. at 514. This limiting instruction, coupled with the common and reasonable reliance on unadjudicated offenses by experts in SVP proceedings, led the court to find no abuse of discretion in the disclosure of the 20 sexual offenses. Id.

Skelton objected to the admission of B.K.'s hearsay allegations through Dr. Teofilo's testimony. The court granted Skelton's motion to exclude any evidence that B.K.'s protection order had been granted but allowed Dr. Teofilo to testify about the contents of the petition for protection order, and that they were made under oath. At trial, before Dr. Teofilo testified about this and other basis evidence, the trial court gave the following limiting instruction to the jury:

> Dr. Teofilo is about [to] testify regarding information contained in the records about Mr. Skelton's alleged background, social history, sexual and non-sexual misconduct, participation in treatment and other programming, and prior statements he made to others besides Dr. Teofilo. You may consider this testimony only in deciding what credibility and weight should be given to his opinions. You may not consider it as evidence that the information relied upon by Dr. Teofilo is true or that the events described actually occurred.

As in Coe and Marshall, the trial court gave an appropriate limiting instruction before Dr. Teofilo testified about B.K.'s allegations. This confined the evidence to the limited purpose of explaining the basis of the expert's opinion. By following Marshall and Coe, the trial court did not abuse its discretion in admitting evidence commonly relied on by experts in SVP cases for the limited purpose of assessing expert witness credibility.

B

Skelton's next evidentiary claim is that B.K.'s out-of-court statements "should have [been] prohibited" as "insufficiently reliable and unduly prejudicial"

under ER 403.  Without reaching Skelton's contention that courts "must . . . always exclude evidence where the danger of unfair prejudice outweighs its potential probative value" or the State's contention that Skelton's failure to request an ER 403 analysis waived any challenge on appeal, we conclude that the court engaged in an ER 403 analysis and did not abuse its discretion.

ER 403 allows courts to exclude evidence if the "probative value" of such evidence is "substantially outweighed" by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, waste of time, or needlessly cumulative evidence.  Skelton sought to prohibit any introduction of B.K.'s allegations through an expert witness or to at least exclude any evidence of B.K.'s no-contact order having been granted by the court.  In response, the State sought to introduce evidence of the fact of the protection order petition, that B.K.'s allegations in it were made under oath.  The trial court balanced the probative value of B.K.'s allegations, and that they were made under oath, against the prejudice of a court seemingly vouching for those allegations by granting the no-contact order.  The court's tailored order was a reasonable exercise of discretion balancing the probative value of B.K.'s allegations as evidence supporting Dr. Teofilo's opinions against the dangers of unfair prejudice in the no-contact order being granted.  The trial court did not abuse its discretion under ER 403.[4]

---

[4] Under the Washington Supreme Court's decisions in Coe and Marshall, we lack the authority to adopt a contrary rule promulgated by the California Supreme Court in Sanchez.  But Washington's approach to expert basis evidence is well in line with the range of approaches the states have taken towards evidence of this nature in SVP cases.  New York's high court described that range in State v. Floyd Y., explaining that a "significant number of jurisdictions take a flexible approach that allows the admission of hearsay but requires courts to make an

III

Skelton claims that Dr. Teofilo, in relaying basis evidence to the jury detailing his two alleged violent rapes of B.K., violated his constitutional right to due process under the Fourteenth Amendment and article 1, section 3 of the Washington Constitution. Civil commitment, as a massive curtailment of liberty, requires robust due process protections. Foucha v. Louisiana, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); In re Det. of Stout, 159 Wn.2d 357, 369, 150 P.3d 86 (2007). Skelton claims that these protections foreclose the trial court's ruling under ER 703, ER 705, and ER 403 allowing Dr. Teofilo to relay inadmissible facts supporting his opinions. To the extent that Skelton seeks to characterize this evidentiary issue as a constitutional one, his argument fails.[5]

---

independent reliability assessment." 22 N.Y.3d 95, 108-09, 2 N.E.3d 204 (2013). New York adopted this approach. Id. at 109. Washington case law does not require an "independent reliability assessment," id., which would at first blush put it nearer the end of the spectrum allowing expert basis evidence without an independent ground for admissibility, id. at 108 (citing In re Care & Treatment of Manigo, 389 S.C. 96, 106, 697 S.E.2d 629 (2010), aff'd, 398 S.C. 149, 728 S.E.2d 32 (2012)). But as noted Washington has repeatedly cautioned against allowing experts to use ER 705 to unfairly bypass the Rules of Evidence, Caril, 23 Wn. App. 2d at 427 (quoting State v. Anderson, 44 Wn. App. 644, 652, 723 P.2d 464 (1986)). When Washington trial courts properly consider and apply those cautions as the trial court did here, Washington effectively curbs evidence that is so unreliable its consideration would be unfair, much as Floyd Y. urged. In Floyd Y., New York did not foreclose the use of hearsay allegations of sexual misconduct not reduced to conviction, though it required a finding they were substantially more probative than prejudicial and preferred live confrontation. 22 N.Y.3d at 110. Skelton does not show, and we are not convinced, that B.K.'s petition would not meet this standard for limited purposes just as it met the standards of Washington's ER 703, ER 705, and ER 403.

[5] Even in criminal cases subject to the Sixth Amendment, "[i]t is not the case" that "phrasing an evidentiary ruling as a constitutional claim provides a means for an end run around the Rules of Evidence." State v. Ritchie, 24 Wn. App. 2d 618, 629, 520 P.3d 1105 (2022), review denied, 1 Wn.3d 1006, 526 P.3d 851 (2023).

Skelton cites Manson v. Brathwaite, 432 U.S. 98, 113-14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) for the proposition that "reliability is the linchpin" in determining the admissibility of evidence under the Fourteenth Amendment, even in state civil cases. Brathwaite relied on the due process clause in establishing a reliability standard for identifications in criminal cases, based on at least six factors, all particularized to eyewitness identification of criminal accused. Id. Washington has rejected the proposition that Brathwaite created a generalized reliability rule independent of suggestive police identification, even in criminal cases. State v. Vaughn, 101 Wn.2d 604, 608-09, 682 P.2d 878 (1984). Skelton cites Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), to support his theory of a Fourteenth Amendment reliability standard for evidence in civil cases. But Holmes, another criminal case,[6] held that a state cannot constitutionally bar certain other-suspect evidence offered by the defendant. Id. at 330-31. Holmes and Brathwaite do not stand for the proposition, put forward by Skelton, that evidence offered in a civil case may be objected to on constitutional grounds as insufficiently reliable, independently of the Rules of Evidence.[7]

---

[6] The court in Holmes did not decide whether its holding derived from the Sixth Amendment or the Fourteenth Amendment, but it relied on a line of cases decided under the compulsory process clause of the Sixth Amendment. Holmes, 547 U.S. at 324-26. Skelton's reliance on Sixth Amendment case law is unavailing.

[7] Citing Lilly v. Virginia, 527 U.S. 116, 131, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), Skelton argues, "Out-of-court statements from nontestifying witnesses are inherently unreliable and therefore inadmissible, absent an exception to the prohibition against hearsay." Skelton misrepresents Lilly. First, Lilly never said that all hearsay was "inherently unreliable"—after all, hearsay meeting the many hearsay exceptions is routinely admitted in evidence because it can be reliable—rather, the opinion censured only the hearsay in those situations "in which the government seeks to introduce 'a confession by an accomplice which incriminates a criminal defendant.' " Lilly, 527 U.S. at 130-31 (quoting Lee v. Illinois, 476 U.S.

Skelton's next authority does not suggest otherwise. Skelton cites State v. Bartholomew, 101 Wn.2d 631, 638-39, 683 P.2d 1079 (1984), for the proposition that article 1, section 3 of the Washington Constitution "provides even greater protection against the admission of unreliable evidence than the Fourteenth Amendment." However, Bartholomew dealt with a criminal sentencing statute that allowed the introduction of "any evidence regardless of its admissibility under the Rules of Evidence," including a defendant's prior criminal activities regardless of conviction. Id. at 640. The problem with which Bartholomew was concerned was evidence admitted without having to meet the Rules of Evidence. Id. The rules include ER 403, which is "premised on allowing evidence which is trustworthy, reliable, and not unreasonably prejudicial." Id. No such concern is presented here, because Skelton's SVP proceeding was decided on the basis of evidence that was required to meet the Rules of Evidence.

Finally, Skelton cites Lassiter v. Department of Social Services of Durham County, N.C., 452 U.S. 18, 33, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), for its holding that "[i]n its Fourteenth Amendment, our Constitution imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair." This statement, at the highest possible level of abstraction, was made in the context of holding there was no right to counsel for an indigent parent facing the termination of parental rights. Id. at 33-34. Lassiter, like the

---

530, 544 n.5, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986)). Second, this statement was not the holding of the court, because it is found in a section of the lead opinion joined by only three justices. Id. at 120, 125. And third, Lilly was decided under the Sixth Amendment. Id. at 120.

other cases cited by Skelton, does not establish a constitutional standard supplanting the Rules of Evidence in civil cases. Skelton fails to show that his constitutional rights were implicated or violated by the trial court's evidentiary rulings applying the Rules of Evidence.

IV

Skelton asserts that the prosecutor committed misconduct by (1) treating B.K.'s out-of-court statements as "substantive evidence" and arguing in closing that the hearsay was "fact," (2) vouching for the basis of Dr. Teofilo's opinion, and (3) asking Dr. Teofilo about one witness (Skelton) commenting on the credibility of another witness (B.K.).

We review claims of prosecutorial misconduct to determine if improper conduct prejudiced the defendant. In re Det. of Sease, 149 Wn. App. 66, 80-81, 201 P.3d 1078 (2009). Prejudice is measured by weighing the strength of the State's case and reversing only if there is a "substantial likelihood that the misconduct affected the jury's verdict." Id. at 81. If a defendant fails to object at trial, the issue of misconduct is waived unless the misconduct was " 'so flagrant or ill-intentioned' " that it caused prejudice not curable by a trial court's admonishment. Id. (quoting State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). During closing arguments, prosecutors are afforded a wide latitude to argue reasonable inferences from the evidence, including evidence regarding witness credibility. State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). On appeal, we consider the prosecutor's arguments within the context of the case,

arguments as a whole, evidence presented, and jury instructions. State v. Slater, 197 Wn.2d 660, 681, 486 P.3d 873 (2021).

Because Skelton did not raise a prosecutorial misconduct objection during trial, we must find that any potential misconduct was flagrant or ill-intentioned. Skelton does not meet this standard.

A

Skelton alleges that the prosecutor treated the limited purpose evidence of B.K.'s petition as substantive evidence. At issue are instances in which the prosecutor, during closing, referred to B.K.'s allegations using the word "fact" and listed the alleged rapes on PowerPoint slides. Of the three times that the prosecutor used the word "fact" to refer to B.K.'s allegation, the first two were clearly made in the context of referring to limited purpose evidence on which Dr. Teofilo relied. This context is shown by the prosecutor's arguments, "The fact that one of the forced vaginal rapes of [B.K.] started when she was asleep . . . , [w]hich Dr. Teofilo explained was right in [Skelton's] wheelhouse," and "in fact, [B.K.] noted, as you heard from Dr. Teofilo, in her protection order that Mr. Skelton knows right from wrong but he disregards it." That was not improper, as the evidence had been admitted for the purpose of supporting Dr. Teofilo's opinions. The third instance in which the prosecutor used the word "fact" invited the jury to consider evidence for a purpose for which it had not been admitted:

> We got—the fact that he committed one of the forcible rapes against [B.K.]—and Dr. Teofilo talked about this when he was detailing her allegation of rape in the protection order—he committed one of the rapes against [B.K.] when she was seven months pregnant and her

family was right outside the house. So that's risky. I mean, it would be much more likely to get caught.

Though improper, this could have been remedied by a timely objection invoking the limiting instruction the jury had already been given, and is presumed to have followed. Coe, 175 Wn.2d at 513-14; Sease, 149 Wn. App. at 81. The PowerPoint slides conveyed only information properly before the jury for a limited purpose. The prosecutor generally respected the limiting instruction and the appropriate use of the information before the jury. To any extent the prosecutor strayed from that, Skelton fails to show ill-intentioned or flagrant conduct.

B

Skelton claims that the prosecutor improperly vouched for the assertions in B.K.'s petition and Dr. Teofilo's reliance on those assertions. Improper vouching occurs when a prosecutor expresses personal belief in the veracity of a witness or otherwise indicates that evidence not presented at trial supports the testimony of a witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). The prosecutor, in discussing Dr. Teofilo's opinion during closing, referred to B.K.'s alleged rapes as a "factor" to consider, told the jury that Dr. Teofilo had "reasonably relied upon this information in forming his opinion," and stated that B.K.'s "firsthand account" was made under oath, adding additional reliability. The prosecutor had qualified this information, telling the jury, "[T]here is nothing unusual, whatsoever, about the methodology that either of the experts employed in this case even if it involved unadjudicated offenses or other things that have not gone to trial." The prosecutor acted within the wide latitude to argue at closing, drawing reasonable inferences, and using B.K.'s allegations for their proper and limited purpose as basis evidence

for Dr. Teofilo's opinion. These arguments did not indicate a personal opinion or allude to outside evidence, and so there was no improper vouching.

C

Skelton's last prosecutorial misconduct claim is that the prosecutor improperly asked Dr. Teofilo about Skelton commenting on B.K.'s credibility. It can be prosecutorial misconduct to ask a witness whether another witness is lying. State v. Ramos, 164 Wn. App, 327, 334, 263 P.3d 1268 (2011). Whether this is misconduct depends on the specific facts and the issue of that witness's credibility. See id. at 334-35. In Ramos, the court held that the defendant being asked whether another witness had a motive to testify untruthfully was improper but not so flagrant or ill-intentioned as to not be curable by court instruction. Id. at 335.

During closing, the prosecutor referenced the question posed to Skelton whether he could think of a reason why B.K. would make up the two alleged violent rapes—asked by Dr. Teofilo in his SVP evaluation, by the prosecutor in Skelton's deposition, and by Skelton's expert witness in his SVP evaluation. Skelton was not asked whether B.K. was telling the truth. Instead he was asked about B.K.'s possible motivation in filing her petition. Skelton's answer was relevant to the basis Dr. Teofilo (and Skelton's expert) used in forming opinions. The testimony of Dr. Teofilo and Skelton's expert indicates that inviting Skelton to respond to the existence of the petition was an appropriate part of their evaluations. It was not misconduct for the prosecutor to reference the inquiry.

V

Skelton claims his constitutional rights to a unanimous verdict were violated by the trial court's refusal of a unanimity instruction. He argues that because the State proved only one diagnosis that could amount to mental abnormality, OSPD, it should have been named in the jury instructions. We disagree.

To commit Skelton as an SVP, the State was required to prove beyond a reasonable doubt that Skelton suffered "from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(19). In In re Det. of Halgren, 156 Wn.2d 795, 809, 132 P.3d 714 (2006), the court held that criminal law unanimity principles apply in SVP cases. However, the court rejected Halgren's argument requiring unanimity on whether the jury found a mental abnormality or a personality disorder based on State v. Petrich, 101 Wn.2d 566, 673 P.2d 173 (1984), abrogated by State v. Kitchen, 110 Wn.2d 403, 759 P.2d 105 (1988). Halgren, 156 Wn.2d at 811. Instead, applying criminal law principles, the court held that mental abnormality and personality disorder were "alternative means" for making an SVP determination. Id. at 810.

The unanimity requirement functions "uniquely" for alternative means crimes. State v. Aguilar, 27 Wn. App. 2d 905, 918, 534 P.3d 360 (2023). When multiple means of committing a crime are implicated, the jury need not be unanimous as to which means it relied on, so long as each means is supported by substantial evidence. State v. Armstrong, 188 Wn.2d 333, 340, 394 P.3d 373 (2017). In a criminal case, if even a single means on which the jury is instructed

is unsupported by sufficient evidence, a conviction will not be affirmed.  Id.  In Skelton's case, the trial court instructed only on mental abnormality.  Skelton does not advocate an "alternative means" unanimity defect, and this court in Sease, 149 Wn. App. at 78, rejected a means-within-a-means analysis, explaining that where the State presented evidence of two personality disorders to support the personality disorder prong, unanimity on one or the other was not required.

Skelton argues instead for a Petrich multiple acts analysis.  In criminal law, multiple acts cases are "cases in which 'the prosecution presents evidence of several acts that could form the basis of one count charged.' " Aguilar, 27 Wn. App. 2d at 924 (quoting State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988)).  In such cases, we require either an election from the State telling the jury what act it should rely on in its deliberations, or an instruction that the jury must unanimously rely on a specific criminal act to support its conviction.  Id.  By asking us to apply a multiple acts analysis, Skelton asks us to conclude the State presented evidence of "several acts" that "could" form the basis of mental abnormality, without an election or an instruction requiring unanimity.  Id.

"Mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others."  RCW 71.09.020(9).  By its terms, the definition invites clinical and forensic examination of multiple facets of a defendant's mental condition.  Skelton was diagnosed with OSPD.  But his having other features of other psychopathologies was relevant to Dr. Teofilo's diagnosis and properly

17

considered by the jury in its determination whether Skelton's "condition" met the statutory definition. Skelton fails to show the State presented evidence of multiple acts that might have independently amounted to a standalone "condition," akin to separate criminal acts requiring application of Petrich unanimity principles. See e.g. State v. Vander Houwen, 163 Wn.2d 25, 38, 177 P.3d 93 (2008) (separate acts of taking game); Aguilar, 27 Wn. App. 2d at 927 (separate acts of rape).

Skelton's condition is not a case of multiple acts. Dr. Teofilo's assessment of Skelton and the State's presentation of it did not necessitate the State to make an election or secure a unanimity instruction. Skelton's right to a unanimous jury verdict was not violated.

VI

Skelton claims the State's burden of proof was lowered when the court refused an instruction defining the word "likely." We are unpersuaded. A trial court's decision to give a certain jury instruction is reviewed for abuse of discretion. Wright v. 3M Co., 1 Wn.3d 795, 805, 533 P.3d 113 (2023). "Jury instructions are proper when, read as a whole, they permit parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." Spivey v. City of Bellevue, 187 Wn.2d 716, 738, 389 P.3d 504 (2017). "Even if an instruction is misleading, it will not be reversed unless it prejudices a party. We presume that juries follow lawful instructions." Id. (citation omitted).

The trial court instructed, " 'Likely to engage in predatory acts of sexual violence if not confined in a secure facility' means that the person more probably than not will engage in such acts if released from detention in this proceeding."

Skelton sought to add, " 'Likely' means the probability the person will commit predatory acts of sexual violence exceeds fifty percent." The trial court acted well within its discretion in using the usual definition defining "likely" as "more probably than not." The instruction accurately stated the law, was not misleading, and allowed Skelton to argue his theory of the case. Skelton has provided no indication that the instruction was prejudicial.

VII

Skelton last states that if no individual errors warrant reversal, he is entitled to reversal due to cumulative errors. The cumulative error doctrine may entitle defendants to a new trial "when cumulative errors produce a trial that is fundamentally unfair." State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Though not generally applied in the civil context, "cumulative error is argued in personal restraint petitions as well as in sexually violent predator actions." Rookstool v. Eaton, 12 Wn. App. 2d 301, 311, 457 P.3d 1144 (2020). Here, the record does not support that error occurred. Thus, there was no cumulative error.

Affirmed.

Birk, J.

WE CONCUR:

Chung, J.

Dwyer, J.

19